IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JACQUELINE LEWIS,

        Plaintiff,

    v.

CITY OF UNION CITY, GA, and
CHIEF OF POLICE CHARLES
ODOM, in his official and individual
capacities,

        Defendants.

CIVIL ACTION FILE NO.

1:12-CV-4038-RWS-JFK

## **FINAL REPORT AND RECOMMENDATION**

Plaintiff Jacqueline Lewis filed the above-styled employment discrimination action against Defendants City of Union City and Chief of Police Charles Odom on November 19, 2012. [Doc. 1]. Plaintiff Lewis brings claims of discrimination based on race, sex, and disability. [Id.]. Plaintiff's claims against Defendant Charles Odom are based on 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. [Doc. 1, Counts II, IV]. The claims against Defendant Union City are brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, the Equal

AO 72A
(Rev.8/82)

Protection Clause, and the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101, *et seq.*[1] [Doc. 1, Counts I-VI]. Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Plaintiff's claims based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted to the court.  [Doc. 59].

## I.    Facts

When evaluating the merits of a motion for summary judgment, the court must "view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party."  Comer v. City of Palm Bay, Florida, 265 F.3d 1186, 1192 (11th Cir. 2001).  However, mere conclusions and unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005).  Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendants' motion [Doc. 59] for summary judgment.

---

[1]Plaintiff's claims based on the Equal Protection Clause and 42 U.S.C. § 1981 are brought pursuant to 42 U.S.C. § 1983.  [Doc. 1, Counts II, IV].

2

Plaintiff Jacqueline Lewis began working for the Union City Police Department as a Police Officer in 2001. [Plaintiff's Deposition ("Pla. Dep.") at 54-55]. Plaintiff was promoted to Detective in 2008 and remained in that position until her termination in July 2010. [Defendants' Statement of Material Facts ("DSMF") ¶ 1]. As a Detective, Plaintiff was required to have "knowledge of the use and effects of law enforcement weapons, methods of self-defense and physical restraint." [DSMF ¶ 3]. Detective work "is performed in an office environment or in a variety of field and office settings and may require exposure to dangerous and life-threatening situations." [DSMF ¶ 4].

On January 29, 2009, while at work, Plaintiff Lewis suffered a heart attack. [Pla. Dep. at 155-59, Exhibit ("Ex.") 19; Quyyumi Dep. at 10, 30-31; Harris Dep. at 24-25; DSMF ¶ 5; Plaintiff's Statement of Material Facts ("PSMF") ¶ 1; Plaintiff's Response ("Pla. Resp.") to DSMF ¶ 5]. Union City Police Chief Charles Odom witnessed Plaintiff having chest pains and asked her if it felt like an elephant was sitting on her chest, to which Plaintiff remarked that it did. [Pla. Dep. at 157; Odom Dep. at 48; PSMF ¶ 2]. Plaintiff asked the dispatcher to call the paramedics, and she was transported to the hospital accompanied by two officers. [Pla. Dep. at 155-59, Ex.

3

19; Quyyumi Dep. at 10, 30-31; Harris Dep. at 24-25; DSMF ¶ 5; PSMF ¶ 1; Pla. Resp. to DSMF ¶ 5].  Plaintiff remained in the hospital for four days.  [Id.].

Dr. Erinn Harris, Plaintiff's primary care physician, testified that "there was no evidence of heart failure" and that Plaintiff only "had a little mild aortic insufficiency [and] mild tricuspid regurgitation . . . ."  [Harris Dep. at 25].  Dr. Arshed Quyyumi, Plaintiff's cardiologist, testified that Plaintiff did not have a clot or heart disease and that her heart attack did not affect her heart function or any other bodily function. [Quyyumi Dep. at 12-13].  Dr. Quyyumi also testified that the severity of Plaintiff's heart attack was "anywhere between minuscule and small" and "that's why the global function of the heart was unaffected."  [Quyyumi Dep. at 31].  Plaintiff remained on leave through the month of February but returned to full, active duty on March 2, 2009. [DSMF ¶ 7].

Dr. Quyyumi wrote in a treatment report that as of May 6, 2009, Plaintiff Lewis had been asymptomatic for three months.  In other words, Plaintiff was only symptomatic for a couple of weeks after her heart attack.  [DSMF ¶ 8; Quyyumi Dep. at 15, 26, Ex. 4].  Plaintiff, however, testified that as a result of her heart attack, she continues to experience "shortness of breath now and then."  [Pla. Dep. at 160].  In a treatment note dated April 12, 2010, Dr. Harris wrote that Plaintiff denied *inter alia*

4

chest pain, irregular heart beats, palpitations, syncope, edema, shortness of breath, and difficulty sleeping, but admitted to paroxysmal nocturne dyspnea. [Harris Dep. 106-08, Ex. 15; PSMF ¶ 6; Defendants' Response ("Def. Resp.") to PSMF ¶ 6]. Dr. Harris testified that paroxysmal nocturne dyspnea means "that sometimes when people lie flat, they get short of breath at night." [Harris Dep. at 108]. Plaintiff continues to take baby aspirin every day as prescribed by her doctor. [Pla. Dep. at 160-63; PSMF ¶ 5].

Plaintiff testified that, as a Detective, she would usually not respond to a call that was in progress but would wait to be assigned to a case. [Pla. Dep. at 115-17; PSMF ¶ 7]. Plaintiff stated that the majority of the time she performed her duties in the office. [Pla. Dep. at 95-96]. Plaintiff testified, "I worked cases. I interviewed suspects, victims. Most of the time, I did my interviewing at my desk or I called them on the phone. I typed up my reports, but most of the time I was in the office." [Pla. Dep. at 96]. Plaintiff also testified that her job description, which states that a Detective "prepares and serves search and arrest warrants," does not accurately reflect what she did. [Pla. Dep. at 105]. Plaintiff stated that she made arrests and "would go out on a search warrant sometimes" but that most of the time the "ACE unit" would serve arrest warrants. [Pla. Dep. at 95, 105; PSMF ¶ 11]. Plaintiff testified that she

5

did not process crime scenes or collect physical evidence and that she did not apprehend suspects.[2]  [Pla. Dep. at 108-11; PSMF ¶ 12].

For law enforcement officers, the force continuum is:  (1) verbal commands; (2) soft empty hands; (3) hard empty hands, which "can be anything from manipulating a joint to a takedown to an OC [pepper] spray to an ASP baton to a Taser;" and (4) deadly force.  [PSMF ¶ 16].  Plaintiff was certified to carry the ASP baton and a gun, and she was trained in the use of less-than-lethal force.  She carried her gun, badge, handcuffs, ASP baton, and a radio on a daily basis.  [PSMF ¶ 19].  Plaintiff did not carry OC/pepper spray because she was not licensed by Union City to carry it and it was not issued to her.  [PSMF ¶ 20].

In 2010, Union City Police Chief Charles Odom decided to purchase Tasers for each officer as an additional tool to help reduce the risk of injury during volatile encounters with suspects.  [DSMF ¶ 12].  Chief Odom testified:

> I believed that the Taser would be more effective than OC spray and the ASP baton at reducing the risk of injury to officers, suspects, and the public because it allows officers to maintain distance from an uncooperative subject when attempting to obtain compliance and effect an arrest, whereas an ASP baton and OC spray require an officer to be in

---

[2]Because Detectives generally do not answer routine calls for service, they are less likely than Patrol Officers to encounter situations which involve fighting. [McClure Dep. at 23-24; PSMF ¶ 13].

6

> close proximity to the uncooperative subject when using the weapons,
> thereby placing the officer at greater risk of injury.

[Odom Declaration ("Dec.") ¶ 6]. The Police Department implemented a policy in June 2010 requiring any officer who was in a position to make an arrest or supervise an arrestee, which included Detectives, to carry a Taser. [Odom Dec. ¶ 5, Ex. C; DSMF ¶ 13]. Taser International does not require officers to be personally exposed to a Taser device to be certified as a user. [Brown Dep. at 34-35]. But, as part of the City's training to become Taser certified, Chief Odom requires that all officers receive a five-second Taser shock.[3] [DSMF ¶ 14]. Chief Odom requires the shock so that officers can (1) evaluate the appropriate circumstances under which to deploy the Taser, (2) testify in court about the effects of the Taser, (3) know that they can go "hands-on" with an uncooperative subject without being shocked, (4) consider how to defend themselves if threatened with a Taser or similar device, and (5) understand what it feels like to be shocked by the Taser in the event of an accidental exposure so that they will have confidence in their ability to survive the experience. [DSMF ¶ 15].

---

[3]The Detective job description, which was drafted by Assistant Chief Lee Brown, does not list as a requirement for Detectives that they be able to receive a Taser shock to perform the essential functions of their job. [Brown Dep. at 33-34; PSMF ¶ 14].

Union City policy requires all officers who are in arrest situations to be certified to carry OC spray.  [DSMF ¶ 43].  In June 2010, Plaintiff Lewis was the only officer in the Union City Police Department who was not certified to carry OC spray.  [Odom Dec. ¶ 8; DSMF ¶ 16].  Plaintiff was scheduled to attend OC training on Thursday, June 17, 2010, at 1:00 p.m.  [DSMF ¶ 17].  However, on June 16, the evening before her scheduled OC training, Plaintiff provided a note from her primary care physician, Dr. Erinn Harris, dated June 15, which stated that Plaintiff was under her care for "several chronic conditions including a heart condition."  Dr. Harris also wrote that she "would not recommend that a Taser gun or OC spray be used on or near" Plaintiff "secondary to her chronic conditions."[4]  [DSMF ¶ 18; PSMF ¶ 24; Harris Dep., Ex. 9].  When Plaintiff produced Dr. Harris' note on June 16, she had not yet been scheduled to attend Taser training.  [DSMF ¶ 19].

Chief Odom determined that Plaintiff was at risk of being exposed in the performance of her duties as a Detective if another officer used or accidentally discharged either OC spray or a Taser in Plaintiff's presence.[5]  [Odom Dec. ¶ 10;

---

[4]Prior to June 2010, Plaintiff never informed the City that she could not perform her duties fully or that she needed any special considerations.  [DSMF ¶ 9].

[5]Since Plaintiff began her employment with Union City in 2001, she was exposed to OC spray on one occasion as a Patrol Officer.  She was never exposed to

8

DSMF ¶ 20].  Chief Odom also determined that Plaintiff's mere presence in the Police Department building created a risk of exposure to OC spray.  [Odom Dec. ¶ 10; Odom Dep. at 43-45; DSMF ¶ 21].  Based on the information received from Dr. Harris, Chief Odom directed that Plaintiff be placed on administrative leave without pay until her doctor cleared her to return to work.  [Odom Dec. ¶¶ 9-10; DSMF ¶ 22; PSMF ¶ 26].

Union City's Human Resources Manager Tracey McCord provided Plaintiff with a Family and Medical Leave Act ("FMLA") certification form on June 23, 2010. McCord suggested that Plaintiff have her doctor complete the form so that she could protect her job if she ran out of leave.  [DSMF ¶ 24; PSMF ¶ 27].  McCord also suggested that Plaintiff have her doctor contact Assistant Chief Lee Brown to discuss the Taser training.  [DSMF ¶ 25].  McCord did not give Plaintiff a deadline by which the FMLA form needed to be returned.  [PSMF ¶ 27].

A week later, on Thursday, July 1, 2010, Plaintiff sent a letter to Chief Odom requesting to resume her duties as a Detective and requesting an accommodation on the Taser and OC training until everything was cleared up with her doctor.  [DSMF ¶ 26; PSMF ¶ 28; Def. Resp. to PSMF ¶ 28].  In the alternative, Plaintiff asked to be allowed to seek part-time employment elsewhere.  [PSMF ¶ 28; Def. Resp. to PSMF

_____

OC spray during her time as a Detective.  [Pla. Dep. at 53-54; PSMF ¶ 21].

9

¶ 28; Brown Dep. at 61-63, Ex. 18].  Plaintiff stated in the letter that she would be out of accrued leave before the end of the week ending July 2.  [Brown Dep. at 61-63, Ex. 18; DSMF ¶ 27].  On the same day, July 1, Assistant Chief Brown sent Plaintiff a letter that stated, "Based on your current job description, your doctor's letter essentially makes it impossible for you to work or be at work; therefore, until your doctor releases you for full duty, your request is denied." [PSMF ¶ 29; DSMF ¶ 28].  Assistant Chief Brown never told Plaintiff that she would be terminated if Dr. Harris did not release her to full duty by a particular date.  [PSMF ¶ 30].

On July 2, 2010, Plaintiff emailed Assistant Chief Brown to tell him that she would be meeting with her doctor on July 7, 2010.  Plaintiff also asked Brown for his cell phone number so Dr. Harris could call him directly.  [PSMF ¶ 31; DSMF ¶¶ 29-30].  On July 6, 2010, Plaintiff sent an email confirming that she would be going to the doctor on July 7, 2010, and again asked Assistant Chief Brown that he send her his cell phone number.  [PSMF ¶ 32].  Brown sent his cell phone number to Plaintiff on July 6 and requested that Plaintiff have her doctor or her doctor's secretary contact him to discuss the situation.  [DSMF ¶ 30].

On the morning of July 7, Plaintiff left Human Resources Manager Tracey McCord a voicemail stating that she would be seeing her doctor at noon and would

have the doctor contact McCord to schedule a call with Assistant Chief Brown. [DSMF ¶ 32]. Dr. Harris received Plaintiff's FMLA paperwork on July 7, 2010. Dr. Harris attempted to call Union City multiple times prior to July 7, 2010, but Plaintiff had not provided her with the correct phone number. [Harris Dep. at 83-86, 94-95, Exs. 10, 12, 13; PSMF ¶¶ 33, 34; Def. Resp. to PSMF ¶¶ 33, 34].

As of 10:00 a.m. on July 8, neither Plaintiff Lewis nor Dr. Harris had contacted Assistant Chief Brown or any City official to discuss Plaintiff's situation. [DSMF ¶ 34]. Chief Odom testified:

> I was made aware that Ms. Lewis had scheduled a doctor's appointment on July 7 to speak with her doctor about her situation and have her FMLA certification completed. I was also made aware that as of 10:00 am on July 8, neither Ms. Lewis nor her doctor had attempted to contact Assistant Chief Brown or Tracie McCord, nor had Ms. Lewis returned her FMLA certification form. I understood that Ms. Lewis had also exhausted all of her accrued leave as of July 5. For these reasons, and because I had not received any information indicating that Ms. Lewis could return to work, I determined that she was absent without leave and made the decision to terminate her employment under the City's Leaves of Absence policy which states that "[a]ny unapproved leave of absence will be cause for dismissal."

[Odom Dec. ¶ 11]. On July 8, 2010, Chief Odom terminated Plaintiff without contacting her. [PSMF ¶ 39]. Plaintiff was asked and testified to the following:

> Q.     Did you have any discussions with Chief Odom relating to the training?

11

A.    I don't recall having a discussion with him.  That's one reason why he was upset.  He told me that had I came to him first and talked to him about it, things would have turned out different.  But being that I didn't, I went to my doctor first, he was upset about that.

Q.    Did he tell you how things could have been different or what he might have been able to do?

A.    He–yeah, he–he told me that I come to him–you know, he had a open-door policy and I would always go to him and talk about things.  And he was concerned that I didn't come to him and talk to him, you know, about that first; that I went to my doctor first.  So I asked him, during our meeting for the appeal for the termination, would things have turned out different, had I came to him.  And he advised me that he don't know whether things would have turned out different.

[Pla. Dep. at 190].  Plaintiff's separation notice stated that she had been terminated for violating Union City's leave policy, Chapter 6, Section 1C, Leaves of Absence: "Any unapproved leave of absence will be cause for dismissal."  [Brown Dep., Ex. 31; PSMF ¶ 40].

On July 8, 2010, shortly after Plaintiff had been terminated, Dr. Harris finally spoke with Human Resources Manager McCord sometime between noon and 2:00 p.m. [Harris Dep. at 83-86, 94-95, Exs. 10, 12, 13; PSMF ¶¶ 33, 34; Def. Resp. to PSMF ¶¶ 33, 34].  Dr. Harris subsequently spoke with Assistant Chief Brown on the same day and told him that she was not as concerned about Plaintiff being exposed to OC/pepper spray as she was about Plaintiff being exposed to a Taser shock.  [PSMF ¶¶ 35, 42]. However, Dr. Harris reiterated her recommendation that Plaintiff not be exposed to a

12

Taser shock due to her heart condition. [DSMF ¶ 36]. Dr. Harris also testified that on July 8, she was still recommending that Plaintiff not be exposed to OC spray. [Harris Dep. at 100-01]. Assistant Chief Brown did not discuss the effects of the Taser with Dr. Harris, and he took no steps to rescind Plaintiff's termination. [PSMF ¶ 42]. Chief Odom was asked and testified to the following:

> Q.  Did you learn at any point that Dr. Harris said she wasn't really concerned about the OC spray?
> A.  Not until after Ms. Lewis's termination.
> Q.  And that was within hours of Ms. Lewis's termination, correct?
> A.  I guess. But it was still after the fact.
> Q.  And the termination could have been rescinded when there were clarifications on what accommodations were necessary, correct?
> A.  I don't know that–I wouldn't sit here and state in my place that I know that Ms. Harris–Dr. Harris made notes of accommodation. I think that the information that was relayed to me was that Dr. Harris said she wasn't as concerned about the OC spray exposure as she might be the Taser exposure. But nonetheless, I don't think–we didn't–other than a–other than a phone call that my assistant chief received from someone, nothing changed. The piece of letter that I had that was authored by her on the letterhead that was provided to me by my employee was I've got a chronic condition, I'm being treated by a doctor, and I can't be exposed to this.

[Odom Dep. at 51-52; PSMF ¶ 43]. On July 12, 2010, Dr. Harris completed and signed the FMLA paperwork. [PSMF ¶ 33].

In accordance with Union City policy, Plaintiff appealed her termination to City Manager Steve Rapson. [DSMF ¶ 37]. During the appeal hearing on July 20, Plaintiff

13

and her attorney were present, and they submitted additional documentation for Rapson to consider. [Pla. Dep. at 211-12]. This included the FMLA certification form which was completed by Dr. Harris on July 12, four days after Plaintiff's termination. [DSMF ¶ 38]. The FMLA certification form indicated that Plaintiff had a lifetime condition that prevented her from performing her job functions and that Plaintiff "should not have a Taser used on her secondary to previous cardiac history." [DSMF ¶ 39]. As noted *supra*, Plaintiff was terminated by Chief Odom for violating Union City's leave policy by being absent without leave. [Brown Dep., Ex. 31; PSMF ¶ 40]. Plaintiff did not raise any leave issue during the appeal hearing before City Manager Rapson, and he upheld Chief Odom's decision to terminate Plaintiff's employment. [Rapson Dep. at 64-68; DSMF ¶ 41].

Detective Sergeant Cliff McClure testified on April 24, 2014, that he was placed on administrative leave two days earlier. [McClure Dep. at 9, 32; PSMF ¶ 46]. McClure was asked and testified to the following:

> A.   I had a medical condition when we did our annual physical training. I did
>      not complete the mile run. I was hospitalized. Determined it was a
>      sodium imbalance. Then I had to go to Concentra for the fit-for-duty test,
>      which I passed everything except standing on one leg for 30 seconds. So
>      I was placed on administrative leave . . . .
> Q.   How long are you going to be on administrative leave?
> A.   Until I go back and retake the test or 90 days.

14

Q.  Or 90 days, whichever comes first, I guess?

A.  I can go back at any time and take the test . . . .  If I fail it, I'm terminated.

[McClure Dep. at 32].  McClure subsequently retook and passed the fit-for-duty examination and returned to work.  [Odom Supplemental ("Supp.") Dec. ¶ 5].

Patrol Officer Walker Heard testified that he failed a physical agility test on February 14, 2013, and was placed on administrative leave without pay for 90 days. In March or April 2014, during his unpaid leave, Heard was offered a position by Union City as a dispatcher.  [Heard Dec. ¶ 6].  On May 9, 2014, Union City terminated his employment after approximately 449 days of administrative leave.  [Heard Dec. ¶¶ 4-7; PSMF ¶ 47].

At the time of the implementation of the Taser program, Patrol Officer Francisco Cedeno requested an accommodation that he not be exposed to a Taser shock. [Cedeno Dep. at 16-19, 25-36; PSMF ¶ 48].  Cedeno testified that he could not remember if he presented a doctor's note to Assistant Chief Brown requesting not to be Tased.  [Cedeno Dep. at 29-30, 36-37].  However, Cedeno did testify that his doctor verbally "voiced his concerns" about Cedeno being exposed to a Taser shock.  [Id.]. Cedeno was allowed to take the Taser class with a group and was later exposed to the Taser in his leg after everyone else and after all of the classes had been completed.

15

[Cedeno Dep. at 29-37].   Additional facts will be set forth as necessary during discussion of Plaintiff's claims.

## II.   Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (amended 2010).  Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  See Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986).

The movant bears the initial burden of asserting the basis of his motion, and that burden is a light one.  See Celotex, 106 S. Ct. at 2553.  The movant is not required to negate his opponent's claim.  See id.  Rather, the movant may discharge this burden

16

merely by "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id. at 2554.

When evaluating a motion for summary judgment, the court must view the evidence and factual inferences in the light most favorable to the nonmoving party. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1309 (11th Cir. 2001). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). Instead, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)).

The court will apply these standards in ruling on the motion for summary judgment.

## III.   Discussion

### A.   Plaintiff's Claims of Disability Discrimination

Plaintiff Jacqueline Lewis alleges that Defendant Union City failed to provide her with a reasonable accommodation and terminated her employment on the basis of her disability in violation of the Americans with Disabilities Act ("ADA"). [Doc. 1,

17

Counts V, VI].  The ADA Amendments Act of 2008 ("ADAAA"), P.L. 110-325, effective January 1, 2009, made significant changes to the law governing application of the Act, particularly making changes to the threshold standard for determining whether an ADA plaintiff is disabled as interpreted in <u>Toyota Motor Mfg., Kentucky, Inc. v. Williams</u>, 122 S. Ct. 681 (2002), and <u>Sutton v. United Air Lines, Inc.</u>, 119 S. Ct. 2139 (1999).  Plaintiff Lewis' heart attack occurred on January 29, 2009; she was placed on administrative leave without pay on June 16, 2010; and she was terminated on July 8, 2010.  "Because the critical events in this case . . . took place after the ADAAA went into effect, we apply the post-ADAAA version of the ADA." <u>Mazzeo v. Color Resolutions Int'l, LLC</u>, 746 F.3d 1264, 1267 (11th Cir. 2014).

The plaintiff carries the burden of proof of demonstrating that the defendant has unlawfully discriminated against her.  <u>See</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 101 S. Ct. 1089, 1093-95 (1981).  In a circumstantial evidence case, such as that herein, the allocation of burdens and order of presentation of proof are as follows: (1) the plaintiff has the burden of proving a *prima facie* case of disability discrimination by a preponderance of the evidence; (2) if the plaintiff proves the *prima facie* case, the court will presume discriminatory intent, and the burden (of production) then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the

18

action taken against the employee; and (3) if the defendant carries this burden, the

presumption of discrimination is eliminated, and the plaintiff has an opportunity to

prove by a preponderance of the evidence that the legitimate reason offered by the

defendant was a pretext for discrimination. See McDonnell Douglas Corp. v. Green,

93 S. Ct. 1817, 1824-25 (1973). "Despite the changes brought about by the ADAAA,

courts still utilize the same McDonnell Douglas burden-shifting analysis used in ADA

and Title VII cases." Beatty v. Hudco Industrial Products, Inc., 881 F. Supp. 2d 1344,

1351 (N.D. Ala. 2012).

The elements necessary to establish a *prima facie* case are identical for

Plaintiff's failure to accommodate claim and her discriminatory termination claim. See

Ryee v. Chapman, 316 Fed. Appx. 901, 905-06 (11th Cir. 2009); Haines v. Cherokee

County, 2010 WL 2821853, at *10 (N.D. Ga. February 16, 2010); McCoy v. Geico

General Ins. Co., 510 F. Supp. 2d 739, 748 (M.D. Fla. 2007). Plaintiff must show: (1)

that she has a disability; (2) that she is a qualified individual; and (3) that she was

discriminated against because of the disability. See Mazzeo, 746 F.3d at 1268. The

ADAAA provides in part: "The term 'disability' means, with respect to an

individual–(A) a physical or mental impairment that substantially limits one or more

major life activities of such individual; (B) a record of such an impairment; or (C)

being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).  The

definition of "disability" is to "be construed in favor of broad coverage of individuals

. . . to the maximum extent permitted by the terms" of the Act.  42 U.S.C. § 12102(4).

To determine whether Plaintiff has a disability under the ADAAA, the court

must first determine whether she has an impairment.  The Equal Employment

Opportunity Commission ("EEOC") defines a physical impairment as "[a]ny

physiological disorder or condition, cosmetic disfigurement, or anatomical loss

affecting one or more body systems, such as neurological, musculoskeletal, special

sense organs, respiratory (including speech organs), cardiovascular, reproductive,

digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and

endocrine[.]" 29 C.F.R. § 1630.2(h)(1).  Plaintiff Lewis argues that she has a chronic

heart condition that constitutes a physical impairment under the ADAAA.  [Doc. 72

at 7-10].  The court agrees.  Plaintiff suffered a heart attack in 2009.  As discussed in

more detail *infra*, Plaintiff asserts that she has occasional shortness of breath.  [Pla.

Dep. at 160].  In a treatment record dated April 12, 2010, Dr. Erinn Harris, Plaintiff's

treating physician, noted that Plaintiff admitted to shortness of breath while lying flat

on her back at night (paroxysmal nocturne dyspnea).  [Harris Dep. 106-08, Ex. 15].

Dr. Harris also found that as a result of her heart attack, Plaintiff "had a little mild

aortic insufficiency [and] mild tricuspid regurgitation . . . ." [Harris Dep. at 25]. The court will assume for summary judgment purposes that Plaintiff's heart condition has an effect, even if only a minimal one, on her respiratory and cardiovascular systems. Therefore, Plaintiff is able to show that her heart condition falls within the definition of a physical impairment. See 29 C.F.R. § 1630.2(h)(1).

The next step requires the court to determine whether Plaintiff's impairment rises to the level of a "disability" under the ADAAA. As previously noted, Plaintiff can meet this requirement by showing that she has an actual disability, a record of disability, or was regarded as having such a disability. Plaintiff contends that she has an actual disability because her heart condition "substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The relevant regulations provide that major life activities also include "[t]he operation of a major bodily function, including . . . respiratory, circulatory, [and] cardiovascular . . . functions. The operation of a major bodily function includes the operation of an individual organ within a body system." 29 C.F.R. § 1630.2(i)(1)(ii).

"The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.2(j)(1)(i). Courts making a disability evaluation must consider whether an impairment "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). An impairment may be substantially limiting even if it does not "prevent, or significantly or severely restrict, the individual from performing a major life activity . . . ." Id. "Nonetheless, not every impairment will constitute a disability within the meaning of [the ADAAA]." Id.

Plaintiff Lewis claims that both her "cardiologist and her primary care physician found that she suffered from a permanent injury to her heart and continues to suffer regurgitation of the mitral, tricuspid, and aortic heart valves." [Doc. 72 at 8]. Plaintiff argues that this evidence establishes that her heart condition is an actual disability because it substantially limits the operation of major bodily functions. The undersigned disagrees. Dr. Harris, Plaintiff's primary care physician, testified that "there was no evidence of heart failure" and that Plaintiff only "had a little mild aortic insufficiency [and] mild tricuspid regurgitation . . . ." [Harris Dep. at 25]. Dr. Arshed Quyyumi, Plaintiff's cardiologist, testified that Plaintiff did not have a clot or heart

22

disease and that her heart attack did not affect her heart function or any other bodily function.  [Quyyumi Dep. at 12-13].  Dr. Quyyumi also testified that the severity of Plaintiff's heart attack was "anywhere between minuscule and small" and "that's why the global function of the heart was unaffected." [Id. at 31].  The record evidence does not support Plaintiff's argument that her heart condition substantially limits a major bodily function, such as the cardiovascular function.

Plaintiff also contends that her "chronic heart condition" causes her to be substantially limited in her ability to breathe.  However, during her deposition, Plaintiff testified that she only experiences "shortness of breath now and then." [Pla. Dep. at 160].  A treatment note from Dr. Quyyumi dated May 6, 2009, states that Plaintiff "continues to be asymptomatic over the last three months." [Quyyumi Dep. at 15, 26, Ex. 4].  Plaintiff's heart attack occurred on January 29, 2009, and according to Dr. Quyyumi, as early as the first half of February 2009, Plaintiff had no chest pain, shortness of breath, palpitations or any other symptoms.  [Id.].  Dr. Quyyumi advised Plaintiff in the May 2009 treatment record to start exercising.  [Id.].  In a treatment note dated April 12, 2010, Dr. Harris wrote that Plaintiff denied *inter alia* shortness of breath, chest pain, irregular heart beats, palpitations, syncope, edema, and difficulty sleeping.  [Harris Dep. 106-08, Ex. 15; PSMF ¶ 6; Def. Resp. to PSMF ¶ 6].  Plaintiff

23

only admitted to paroxysmal nocturne dyspnea, which Dr. Harris described as follows: "sometimes when people lie flat, they get short of breath at night." [Harris Dep. at 108].

In summary, the evidence before the court reveals that Plaintiff's heart attack, which her cardiologist described as being between minuscule and small, did not affect her heart function or any other bodily function. Plaintiff alleges that as a result of the heart attack, she experiences shortness of breath. However, even Plaintiff stated that this occurs only occasionally. Plaintiff's cardiologist found that she had no shortness of breath or any other symptom within a couple of weeks of her heart attack. In a single treatment record, Plaintiff's primary care physician noted only that she complained of some shortness of breath while lying down flat at night. Plaintiff was otherwise asymptomatic. A reasonable jury could not examine these facts and conclude that Plaintiff's heart condition "substantially limits" a major bodily function or a major life activity. See 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(i)(1)(ii). Plaintiff, therefore, is unable to show that she has an actual disability.

The ADAAA, as noted *supra*, provides that the term "disability" refers not only to an actual disability but also to a record of a disability. 42 U.S.C. § 12102(1). "An individual has a record of a disability if the individual has a history of, or has been

AO 72A

(Rev.8/82)

misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). "The intent of the record of prong of the ADA, in part, is to ensure that people are not discriminated against because of a history of disability." Couts v. Beaulieu Group, LLC, 288 F. Supp. 2d 1292, 1305 (N.D. Ga. 2003) (citation and internal quotation marks omitted). As previously discussed, although Plaintiff suffered a mild heart attack, she "has failed to show the existence of any record that indicates that Plaintiff has, or had, a substantially limiting impairment." Id. The evidence also would not permit a reasonable jury to conclude that Plaintiff was ever misclassified as having a disabling impairment. Because Plaintiff "cannot show she was disabled under the ADA, she also lacks a record of a disabling impairment." Vaughan v. World Changers Church Intern., Inc., 2014 WL 4978439, at *10 n.7 (N.D. Ga. September 16, 2014).

Although Plaintiff is unable to establish that she has an actual disability or a record of a disability, she may still satisfy the disability requirement of the ADAAA if she is able to show that she was "regarded as" disabled. 42 U.S.C. § 12102(1)(C). "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental

25

impairment whether or not the impairment limits or is perceived to limit a major life activity."[6] 42 U.S.C.A. § 12102(3)(A). "As should be readily apparent, the ADAAA expanded the scope of the ADA's 'regarded as' clause to cover perceived impairments even if no one thought those impairments were substantial." DiGiosia v. Aurora Health Care, Inc., ___ F. Supp. 3d ___, ___, 2014 WL 4749241, at *6 (E.D. Wis. September 24, 2014).  "The puzzling result is that plaintiffs are now entitled to protection under the ADA without evidence that they are 'disabled,' or that an employer regarded them as such.  It is enough that an employer took some adverse employment action because of some impairment, whether real or imagined, no matter how insubstantial." Jennings v. Dow Corning Corp., 2013 WL 1962333, at *9 (E.D. Mich. May 10, 2013); accord Hilton v. Wright, 673 F.3d 120, 129 (2nd Cir. 2012) (holding that plaintiff "was only required to raise a genuine issue of material fact about whether [plaintiff's employers] regarded him as having a mental or physical impairment; however, plaintiff was not required to present evidence of how or to what degree they believed the impairment affected him"); Mendoza v. City of Palacios, 962

---

[6]An individual, however, will not be able to meet the requirement of being "regarded as" disabled if her impairment is "transitory and minor.  A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).

F. Supp. 2d 868, 871 (S.D. Tex. 2013) (noting that "in 'regarded as' cases, a plaintiff now need only show that his employer perceived him as having an impairment; he is not required to show that he is substantially limited in a major life activity . . . .").

The court has previously noted that a physical impairment is defined by the regulations as "[a]ny physiological disorder or condition . . . affecting one or more body systems . . . ." 29 C.F.R. § 1630.2(h)(1).  Plaintiff's heart condition allegedly causes occasional shortness of breath.  In addition, her treating physician found that as a result of her heart attack, she "had a little mild aortic insufficiency [and] mild tricuspid regurgitation . . . ."  [Pla. Dep. at 160; Harris Dep. at 25].  As discussed *supra*, Plaintiff's heart condition constitutes a physical impairment under the ADAAA because it has at least a minimal effect on her respiratory and cardiovascular systems.

To meet the "regarded as" requirement for establishing a disability, Plaintiff Lewis must show that Defendant Union City subjected her to a prohibited action[7] "because of" her physical impairment, that is, her heart condition.  See 42 U.S.C.A. § 12102(3)(A).  "[B]y incorporating the 'because of' clause into the definitional section,

---

[7]"Prohibited actions include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment . . . ." 29 C.F.R. § 1630.2(l)(1).

27

the ADAAA (somewhat strangely) builds causation into the very definition of disability itself." DiGiosia, ___ F. Supp. 3d at ___, 2014 WL 4749241, at *6 (citing Pinckney v. Federal Reserve Bank of Dallas, 2013 WL 5461873, at *11 (W.D. Tex. September 30, 2013)).  Defendant took a prohibited action against Plaintiff when the City placed her on involuntary leave in June 2010.  The involuntary leave subsequently led to Plaintiff's termination.   The remaining issue is whether Defendant placed Plaintiff on leave "because of" her heart condition.  42 U.S.C.A. § 12102(3)(A).

Chief Charles Odom witnessed Plaintiff's heart attack on January 29, 2009. [Odom Dep. at 48-49].  Although Chief Odom was not immediately informed about Plaintiff's diagnosis, he witnessed her having chest pains, pain in her left arm, and shortness of breath.  [Id.].  Approximately sixteen months later, on or around June 16, 2010, Plaintiff gave Chief Odom a letter from her physician which read, in part: "Ms. Lewis is under my care for several chronic conditions including a heart condition. Therefore, I would not recommend that a Taser gun or OC spray be used on or near her secondary to her chronic conditions."  [Harris Dep., Ex. 9].  The next day, June 17, 2010, Plaintiff was placed on administrative leave.  [Odom Dep. at 28-49; Brown Dep. at 21-22, Ex. 13].  In the letter notifying Plaintiff of her administrative leave, Assistant Chief Lee Brown explained that in Plaintiff's position as a Detective, she was required

28

to perform her job duties in a variety of settings and that this "may require you to dangerous or life threatening situations." [Brown Dep. at 21-22, Ex. 13]. Assistant Chief Brown also wrote that in Plaintiff's position, there was a likelihood that she would be exposed to a Taser or OC spray and that pursuant to her physician's instructions, she was not to come into contact with either. [Id.]. Brown then informed Plaintiff that she was "placed on administrative leave without compensation until such time your physician releases you to return to full and active duty." [Brown Dep. at 21-22, Ex. 13].

The court finds that a reasonable jury could conclude that Defendant placed Plaintiff on leave "because of" her heart condition. 42 U.S.C.A. § 12102(3)(A). Plaintiff has offered evidence that Defendant knew that she had a heart attack in January 2009. Defendant also learned from Plaintiff's physician in June 2010 that she should not be near a Taser or OC spray due to her heart condition. Immediately thereafter, Defendant placed Plaintiff on leave because of these restrictions. "Accordingly, pursuant to the broadened standards of the ADAAA, the Court finds such evidence sufficient to show that Plaintiff was regarded as disabled." Azzam v. Baptist Healthcare Affiliates, Inc., 855 F. Supp. 2d 653, 661 (W.D. Ky. 2012); accord Harty v. City of Sanford, 2012 WL 3243282, at *5 (M.D. Fla. August 8, 2012)

29

(holding that evidence the employer knew of the plaintiff's restrictions and "'asked [him] to resign because of [his] restrictions'" was sufficient to establish that the employer regarded the plaintiff as disabled) (citation omitted).

Although Plaintiff is considered disabled, her failure to accommodate claim must be dismissed. The relevant regulations provide that an employer "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." 29 C.F.R. § 1630.9(e). Plaintiff does not have an actual disability or a record of disability but only meets the definition of disability under the ADAAA because she was "regarded as" disabled. Defendant correctly notes that for this reason, the City was not required to provide Plaintiff with a reasonable accommodation. [Doc. 59 at 28]. As a result, summary judgment is warranted on Plaintiff's failure to accommodate claim. Plaintiff's only remaining ADAAA claim is that she was placed on leave and terminated from her employment with Defendant Union City on the basis of her disability.

Because Plaintiff is able to establish that she has a disability, the next *prima facie* element requires her to show that she is a "qualified individual" under the ADAAA. See Mazzeo, 746 F.3d at 1268. A "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential

functions of the employment position that such individual holds or desires." 42 U.S.C.

§ 12111(8).  If the plaintiff cannot perform an essential function of her job, then she

is not a "qualified individual" and is unable to establish a *prima facie* case.  See Davis

v. Florida Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000).  "The term

essential functions means the fundamental job duties of the employment position the

individual with a disability holds or desires.  The term 'essential functions' does not

include the marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  The ADA

provides, "[C]onsideration shall be given to the employer's judgment as to what

functions of a job are essential, and if an employer has prepared a written description

. . ., this description shall be considered evidence of the essential functions of the job."

42 U.S.C.A. § 12111(8).  "Courts consider the employer's judgment regarding whether

a function is essential, as well as (1) the amount of time spent on the job performing

the function, (2) the consequences of not requiring the individual to perform the

function, (3) the terms of a collective-bargaining agreement, (4) the work experience

of individuals who held the job in the past, and (5) the work experience of individuals

currently in similar jobs."  Anderson v. Embarq/Sprint, 379 Fed. Appx. 924, 927-28

(11th Cir. 2010) (citing Holly v. Clairson Industries, L.L.C., 492 F.3d 1247, 1257-58

(11th Cir. 2007)).  In addition, "'Performing the essential functions of a job means,

among other things, being able to perform those functions without risk of serious physical harm to oneself or others.'" Dickerson v. Secretary, Dep't of Veterans Affairs Agency, 489 Fed. Appx. 358, 360 (11th Cir. 2012) (quoting Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1126 (11th Cir. 1993)).[8]

The Union City Police Department determined that it was necessary for its officers who are in arrest situations to carry OC spray and Tasers.  [Odom Dec. ¶ 5, Ex. C; DSMF ¶¶ 13, 43].  Tasers were purchased in 2010 for each officer because in the judgment of Police Chief Charles Odom, Tasers reduce the risk of injury to officers, suspects, and the public.  Chief Odom testified that a Taser "allows officers to maintain distance from an uncooperative subject when attempting to obtain compliance and effect an arrest . . . ."  [Odom Dec. ¶ 6].  Chief Odom also requires all officers to receive a five-second Taser shock so that they can (1) evaluate the appropriate circumstances under which to deploy the Taser, (2) testify in court about the effects of the Taser, (3) know that they can go "hands-on" with an uncooperative subject without

---

[8]The plaintiff in Dickerson brought a claim for disability discrimination under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, not the ADA.  Dickerson, 489 Fed. Appx. at 359.  However, the Eleventh Circuit noted, "Discrimination claims under the Rehabilitation Act are governed by the same standards used in cases brought under the Americans with Disabilities Act . . . .  Thus, cases decided under the ADA and the Rehabilitation Act may be used interchangeably."  Id. at 360 n.2 (citations omitted).

being shocked, (4) consider how to defend themselves if threatened with a Taser or similar device, and (5) understand what it feels like to be shocked by the Taser in the event of an accidental exposure so that they will have confidence in their ability to survive the experience.  [DSMF ¶¶ 14, 15].

Plaintiff's primary care physician, Dr. Erinn Harris, wrote in a June 2010 letter to Chief Charles Odom that she "would not recommend that a Taser gun or OC spray be used on or near [Plaintiff] secondary to her chronic conditions."  [Harris Dep., Ex. 9].  Although the Union City Police Department contends that the fundamental job duties of a Detective require carrying OC spray and a Taser and being exposed to them during training, Plaintiff disagrees.  Plaintiff contends that she performed her job, and could have continued to perform her job, without being certified to carry OC spray and a Taser and that the selection of which weapon to carry is left to the officer's discretion.  [Doc. 72 at 14-18].  Therefore, according to Plaintiff, carrying and being exposed to OC spray and a Taser are not essential functions of her job as a Detective.

The difficulty with Plaintiff's argument is that she is asking the court to find that being trained and certified to carry certain weapons are not essential functions of an officer's job, despite a uniformly-implemented law enforcement policy requiring such training and certification.  As noted *supra*, the court is required to give consideration

to the employer's judgment as to what functions of a job are essential. 42 U.S.C.A. § 12111(8). The employer's judgment is especially important in cases where the employer is a law enforcement department and the functions at issue involve weapons and officer safety. See Robert v. Carter, 819 F. Supp. 2d 832, 844-45 (S.D. Ind. 2011); Ethridge v. State of Alabama, 860 F. Supp. 808, 816 (M.D. Ala. 1994). Law enforcement officials, not judges, are experts in making determinations about issues involving weapons, certifications, training, and safety. See Robert, 819 F. Supp. 2d at 844 ("[T]he Hamilton County Sheriff's Department is better equipped than the Court to determine how best to protect the public and its deputies."). When a law enforcement organization makes a reasonable determination that being trained and certified to carry certain weapons are essential for its officers, courts should normally defer to the expertise of law enforcement officials. See id (holding that "the TASER exposure requirement, as determined by Sheriff Carter, is essential to the role of civil deputy process server"); Ethridge, 860 F. Supp. at 816 (finding that shooting a handgun in a "Weaver stance" is an "essential function" that must be performed by police officers).

The undersigned finds that being exposed to and carrying OC spray and a Taser were essential functions of a Detective's job in the Union City Police Department. The

34

Department implemented a policy requiring all officers who are in arrest situations to be certified to carry these weapons, and exposure was required by the Department for certification. [DSMF ¶ 43; Odom Dec. ¶¶ 5-7]. Police Chief Charles Odom stated that he required each officer to carry a Taser because the weapon reduces the risk of injury to officers, suspects, and the public. [Odom Dec. ¶ 6]. Chief Odom also offered a number of reasons for requiring all officers to receive a five-second Taser shock in order to obtain certification. [DSMF ¶¶ 14, 15]. There is no evidence that Union City allowed any officer to be excused from the exposure requirements or that the policy was not applied consistently.[9] "Absent compelling evidence to the contrary, the Court is reluctant to challenge a uniformly-implemented policy of law enforcement." Robert, 819 F. Supp. 2d at 845. Plaintiff Lewis was unable to perform the essential functions of her job as a Detective, because, according to her physician's recommendations, she was unable to be exposed to and carry OC spray and a Taser. [Harris Dep., Ex. 9]. Accordingly, she has failed to show that she is a "qualified individual" under the ADAAA. See Robert, 819 F. Supp. 2d at 845 (holding that plaintiff's "inability to participate in the TASER training and, consequently, his inability to use a TASER,

---

[9]In fact, Officer Phil Frieder, who worked in information technology and was not in a position to make arrests as part of his normal job duties, gave up his arrest powers, his badge and gun, instead of being Tased. [DSMF ¶ 48].

render him unable to perform his essential job functions"); Ethridge, 860 F. Supp. at 816.  Plaintiff cannot establish a *prima facie* case of disability discrimination, and summary judgment is warranted on this basis.

Assuming that Defendant had permitted Plaintiff not to carry OC spray or a Taser, she still would not have been able to perform the essential functions of a Detective.  Plaintiff's physician, Dr. Harris, stated in her letter to Chief Odom that neither OC spray nor Tasers should be used "near" Plaintiff due to her heart condition. [Harris Dep., Ex. 9].  A Detective in the Union City Police Department must be able to be near the use of Tasers and OC spray because the position requires working with other officers who carry and are authorized to use these weapons.[10]  [Odom Dec. ¶¶ 5, 8].  Thus, being near Tasers and OC spray is an essential function of a Detective.  The recommendations made by Dr. Harris indicate that Plaintiff would not be able to work as a Detective without a significant risk of substantial harm to herself.  See Dickerson, 489 Fed. Appx. at 360.  Plaintiff's inability to carry out the function of working with

---

[10]Although Plaintiff was never exposed to pepper spray while working as a Detective for Union City, she was exposed to pepper spray on one occasion as a Patrol Officer.  [Pla. Dep. at 53-54; PSMF ¶ 21].

other officers means that she is not a qualified individual and, therefore, cannot establish a *prima facie* case of disability discrimination.[11]

ADAAA regulations provide that an employer may need "to initiate an informal, interactive process" with the employee to identify her limitations and reasonable accommodations. 29 C.F.R. § 1630.2(o)(3). Plaintiff Lewis argues that if Defendant Union City had engaged in an interactive process with Plaintiff and her doctor in order to determine an appropriate accommodation, the City would have learned that Dr. Harris was not concerned about Plaintiff carrying the Taser or having the OC spray used near her. [Doc. 72 at 19-20, 22-30]. Instead, according to Plaintiff, Dr. Harris testified that she was only concerned about the Taser being used directly on Plaintiff. [Doc. 72 at 19, 28; Harris Dep. at 99, 110]. Plaintiff argues that the interactive process

---

[11]Based on the same reasoning, the court finds that even if Plaintiff could establish a *prima facie* case of disability discrimination, Defendant would be entitled to summary judgment due to the "direct threat" defense. See 42 U.S.C. § 12113(a); [Doc. 59 at 30-31]. The ADA provides that an employer may assert such a defense to a charge of discrimination when the employee "pose[s] a direct threat to the health or safety of the individual or others in the workplace." 29 C.F.R. § 1630.15(b)(2). "Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). Because Plaintiff's presence near the use of OC spray and Tasers while in the workplace posed a significant risk of harm to her health, Union City is able to establish the direct threat defense and summary judgment is warranted on this basis.

37

also might have led Defendant to discover that Plaintiff "could have been Tased in the leg, like the accommodation given" to another Union City officer named Francisco Cedeno. [Doc. 72 at 19]. These arguments are unpersuasive.

As previously discussed, an employer "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." 29 C.F.R. § 1630.9(e). Plaintiff only meets the definition of disability under the ADAAA because she was "regarded as" disabled, and the City was not required to provide Plaintiff with an accommodation. For this reason, the City also was under no obligation to initiate an interactive process to identify Plaintiff's limitations and possible accommodations. See Burton v. Freescale Semiconductor, Inc., 2014 WL 4165382, at *2 n.3 (W.D. Tex. August 7, 2014); Perdick v. City of Allentown, 2013 WL 3231162, at *3 (E.D. Pa. June 27, 2013). Defendant was informed by Plaintiff's physician, Dr. Harris, that she "would not recommend that a Taser gun or OC spray be used on or near [Plaintiff] secondary to her chronic conditions." [Harris Dep., Ex. 9]. Union City was not required under the ADA to contact Dr. Harris and ask her if she really meant what she wrote. And it is not relevant that Dr. Harris later testified that what she wrote in the letter was not correct and that she actually believed that Tasers could, in fact, be used near Plaintiff.

38

Defendant followed the physician's recommendations as they were presented in the letter.   Moreover, at the time of Plaintiff's termination, Dr. Harris was still recommending that Plaintiff not be exposed to OC spray.  [Harris Dep. at 100-01].  As previously noted, Plaintiff contends that Defendant "might have discovered that [she] could have been Tased in the leg," but she cites to nothing in support thereof.  [Doc. 72 at 19].  In fact, this assertion is directly contradicted by all the relevant evidence in the record, including the testimony of Dr. Harris.  [Harris Dep. at 99, 110].

In conclusion, Plaintiff only meets the ADAAA's definition of disability under the "regarded as" prong.  Defendant was not required to provide Plaintiff with a reasonable accommodation or initiate an interactive process.  Moreover, a reasonable jury could not examine the evidence in the record and conclude that Plaintiff was able to perform the essential functions of her job.  Being exposed to and carrying OC spray and a Taser were essential functions of a Detective's job in the Union City Police Department, and Plaintiff's primary care physician recommended that Tasers and OC spray not even be used near her.  Plaintiff is not a qualified individual under the ADAAA, and she is unable to establish a *prima facie* case of disability discrimination. The undersigned, therefore, **RECOMMENDS** that Defendants' summary judgment

39

motion [Doc. 59] be **GRANTED** on Plaintiff's ADAAA claim for discrimination based on disability.

### B.   Plaintiff's Claims of Discrimination Based on Race and Sex

Plaintiff Lewis alleges that Defendants terminated her employment on the basis of her race and sex.  [Doc. 1, Counts I-IV; Doc. 72 at 34-39].  Plaintiff's claims against Defendant Chief Charles Odom are based on 42 U.S.C. § 1981 (race) and the Equal Protection Clause (sex).  [Doc. 1, Counts II, IV].  Plaintiff's claims against Defendant Union City are based on Title VII (race and sex), § 1981 (race), and the Equal Protection Clause (sex).  [Doc. 1, Counts I-IV].  Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Section 1981 provides, in pertinent part:  "All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens. . . ."  42 U.S.C. § 1981(a).

Plaintiff's § 1981 and Equal Protection claims are brought pursuant to 42 U.S.C. § 1983.  [Doc. 1, Counts II, IV].  Section 1983 provides, in pertinent part: "Every person who, under color of any statute . . . of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured

40

by the Constitution and laws, shall be liable to the party injured in an action at law. . . ." 42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 99 S. Ct. 2689, 2694 n.3 (1979).  Because § 1981, § 1983, and Title VII all "require a showing of discriminatory motive," the elements necessary to establish a *prima facie* case of discrimination are identical.  Lee v. Conecuh County Bd. of Educ., 634 F.2d 959, 962 (5th Cir. 1981); accord Springer v. Convergys Customer Mgmt. Group Inc., 509 F.3d 1344, 1347 n.1 (11th Cir. 2007); Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

Plaintiff relies on circumstantial evidence to support her claims of discrimination based on race and sex.  Therefore, the court will use the McDonnell Douglas burden-shifting framework to evaluate Plaintiff's claims.  To establish a *prima facie* case of discrimination, Plaintiff must prove that: (1) she is a member of a protected class; (2) she was qualified for the job at issue; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably.  See Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  Defendants concede that Plaintiff is

41

able to establish the first and third *prima facie* elements because she is a black female who was placed on administrative leave without pay and was subsequently terminated on July 8, 2010.

Defendants argue, however, that Plaintiff is not able to establish the second *prima facie* element. In June 2010, the Union City Police Department began requiring all law enforcement officers to obtain certifications to carry OC spray and a Taser. Defendants contend that Plaintiff was unable to obtain the necessary certifications based on the recommendation of her physician. As discussed *supra*, Dr. Erinn Harris wrote in a note to Defendants that she "would not recommend that a Taser gun or OC spray be used on or near [Plaintiff] secondary to her chronic conditions." [Harris Dep., Ex. 9]. Therefore, according to Defendants, Plaintiff was not qualified for the Detective position. [Doc. 59 at 33]. The court disagrees.

Plaintiff correctly notes that "Defendants fail to draw the distinction between a qualified individual under the ADAAA and qualified under Title VII and § 1981." [Doc. 72 at 35]. "[I]n discharge or demotion cases, where a plaintiff has held a position for a significant period of time, qualification for *that* position, sufficient to satisfy the test of a prima facie case can be inferred." Pace v. Southern Railway Sys., 701 F.2d 1383, 1386 n.7 (11th Cir. 1983) (emphasis in original). Plaintiff began

42

working for the Union City Police Department as a Police Officer in 2001, and she was in the position of Detective for approximately two years from 2008 until her termination in July 2010. [Pla. Dep. at 54-55; DSMF ¶ 1]. The court finds that the two-year period is sufficient to allow a reasonable jury to infer that Plaintiff was qualified to be a Detective. See Rosenfield v. Wellington Leisure Products, Inc., 827 F.2d 1493, 1495 n.2 (11th Cir. 1987) ("[I]n cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred.").[12] Plaintiff, therefore, is able to establish the first three *prima facie* elements.

To establish the final element, Plaintiff Lewis must offer evidence that Defendants treated similarly situated male or non-black employees more favorably. In Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306 (11th Cir.), partial superseding opinion on denial of rehearing, 151 F.3d 1321 (11th Cir. 1998), the Eleventh Circuit emphasized that the proper comparison is to employees that are "'similarly situated in all relevant respects.'" Id. at 1311 (quoting Holifield, 115 F.3d

---

[12]The Eleventh Circuit has also held that "plaintiffs, who have been discharged from a previously held position, do not need to satisfy the McDonnell Douglas prong requiring proof of qualification." Damon v. Fleming Supermarkets Of Florida, Inc., 196 F.3d 1354, 1360 (11th Cir. 1999) (citation and internal quotation marks omitted).

at 1562).  The court wrote, "'In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'"  Id. (quoting Holifield, 115 F.3d at 1562).  Thus, to establish this element of the *prima facie* case, Plaintiff must produce evidence that would permit a jury to conclude that similarly situated male or non-black employees were treated more favorably by Defendants.  See Lathem v. Dep't of Children and Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999) (the relevant inquiry is whether the employer subjected similarly situated employees to different employment policies).

In support of her "similarly situated" argument, Plaintiff cites to Defendants' treatment of Patrol Officer Francisco Cedeno (Latino male), Detective Sergeant Cliff McClure (white male), and Patrol Officer Walker Heard (white male).  [Doc. 72 at 37-38].  Plaintiff alleges that Officer Cedeno requested an accommodation similar to the request made by Plaintiff regarding Taser training.  However, unlike Plaintiff, who was placed on administrative leave and terminated, Cedeno was given the Taser training with an accommodation.  [Id.].  Plaintiff argues that Defendants gave favorable treatment to Detective Sergeant McClure after he failed a required balance test.  McClure was subsequently placed on paid administrative leave and was given 90 days

44

to retake the test.  In contrast, Plaintiff was placed on administrative leave without pay and was terminated 21 days later.  [Doc. 72 at 37].  According to Plaintiff, Patrol Officer Heard was similarly situated because he failed a physical agility test and, like Plaintiff, was placed on administrative leave.  But unlike Plaintiff, Defendants allowed Heard to remain on administrative leave for over a year and they later offered him an accommodation.[13]  [Id.].

For a number of reasons, the court finds that the three male officers identified by Plaintiff are not proper comparators.  Eleventh Circuit caselaw provides that a plaintiff seeking to establish a *prima facie* case of discrimination must show that she

---

[13]Plaintiff makes a reference to "approximately eight other (non-black, male and female) officers [who] disclosed conditions they believed could be exacerbated by exposure to the Taser shock but were not placed on leave or terminated."  [Doc. 72 at 37].  Plaintiff, however, does not explain how these officers were similarly situated.  For example, Plaintiff's doctor informed Defendants that she could not be near the use of a Taser or OC spray, but Plaintiff does not allege that the eight officers were nearly identical in this respect.  Plaintiff also does not assert that Defendants permitted these officers to avoid exposure to a Taser shock or OC spray during the certification process or that they were not required to obtain certification.  In fact, Plaintiff does not even identify the names of these officers.  Instead, she simply cites to some deposition testimony and a large number of exhibits.  [Id. at 37-38].  The court, however, will not search through the cited testimony and exhibits in an effort to find similarities between Plaintiff and the unnamed individuals.  Plaintiff's vague and conclusory assertion is insufficient to meet her burden at summary judgment.  See Ellis, 432 F.3d at 1326 ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

45

and the comparator are "nearly identical." Burke-Fowler v. Orange County, Florida, 447 F.3d 1319, 1323 (11th Cir. 2006); Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004). "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." McCann v. Tillman, 526 F.3d 1370, 1374 (11th Cir. 2008) (citation and internal quotation marks omitted). The relevant facts involving Cedeno, McClure, and Heard, when compared to Plaintiff, are not so similar as to be nearly identical.

Plaintiff is correct that at the time of the implementation of the Taser program, Officer Cedeno requested an accommodation that he not be exposed to a Taser shock. [Cedeno Dep. at 16-19, 25-37; PSMF ¶ 48]. Cedeno testified that he could not remember if he presented a doctor's note to Assistant Chief Brown requesting not to be Tased. [Cedeno Dep. at 29-30, 36-37]. However, Cedeno did testify that his doctor verbally "voiced his concerns" about Cedeno being exposed to a Taser shock. [Id.]. After Cedeno's physician spoke with Union City officials, Cedeno was allowed to be exposed to the Taser in his leg, and he obtained the necessary certification to carry a Taser. [Cedeno Dep. at 29-37]. In contrast, Defendants never exposed Plaintiff to a Taser shock after her physician, Dr. Erinn Harris, wrote a letter to Union City stating

46

that she would not recommend that a Taser "be used on or near" Plaintiff "secondary to her chronic conditions." [Harris Dep., Ex. 9]. Plaintiff's physician also recommended that she not be exposed to OC spray. [Harris Dep. at 100-01 and Ex. 9]. Defendants followed Dr. Harris' recommendations, and, as a result, Plaintiff did not obtain the certifications necessary to carry either a Taser or OC spray. Plaintiff Lewis has failed to show that she and Cedeno are nearly identical comparators.

Plaintiff notes that Detective Sergeant McClure and Patrol Officer Heard each failed a physical fitness test. [Heard Dec. ¶ 6; Odom Supp. Dec. ¶ 2; Doc. 72 at 37]. McClure testified that due to a medical condition, he did not complete a required one-mile run as part of an annual fitness examination. [McClure Dep. at 32]. He was hospitalized and subsequently failed the balancing portion of a "fit-for-duty" test. [Id.]. McClure was then placed on administrative leave. [Id.]. Within 90 days, McClure retook and passed the fit-for-duty examination and returned to work. [Odom Supp. Dec. ¶ 5].

Like McClure, Patrol Officer Heard failed a fit-for-duty examination and was placed on administrative leave. [Odom Supp. Dec. ¶ 2]. Chief Odom testified that while Heard was on leave, his attorney sent Odom a letter requesting that the physical fitness test be waived for Heard. [Id. ¶ 3]. Odom did not waive the fitness test but

47

offered Heard the opportunity to transfer to a vacant dispatcher position subject to completing the requisite training. [Id. ¶ 4]. Odom held the position open for Heard for approximately eleven months while his attorney was in communication with Union City's attorney. [Id.; Heard Dec. ¶ 6]. During this time, Heard remained on unpaid leave. [Id.]. On May 9, 2014, Union City terminated Heard's employment after Odom offered him the dispatcher position a final time and he declined. [Heard Dec. ¶¶ 4-7; PSMF ¶ 47; Odom Supp. Dec. ¶ 4].

The problem for Plaintiff in relying on McClure and Heard as comparators is that the two men failed physical fitness tests, not a test involving certification to carry weapons like Plaintiff. Moreover, although both McClure and Heard failed the fitness tests, they actually took the required examinations. They did not inform the City that they were unable even to take the tests. Plaintiff, on the other hand, submitted a letter to Defendants from her primary care physician stating that she should not even be near the use of a Taser or OC spray. [Harris Dep., Ex. 9]. Plaintiff submitted the letter on the evening before she was scheduled to attend OC training. An officer's exposure to a Taser shock and OC spray was required by Union City to obtain the necessary certifications, and Plaintiff did not become certified to carry these weapons. In contrast, there is no evidence or even an allegation that McClure and Heard were not

48

certified to carry a Taser, OC spray, or any other weapon. Another dissimilarity between Plaintiff and the two men is that Plaintiff, pursuant to her physician's recommendations, could not work with other officers who carried OC spray and Tasers without serious risk of harm. [Harris Dep., Ex. 9; Odom Dec. ¶ 10].

A reasonable jury could not examine the facts of this case and conclude that Plaintiff is "'similarly situated in all relevant respects'" to Cedeno, McClure, or Heard. Jones, 137 F.3d at 1311 (quoting Holifield, 115 F.3d at 1562). Plaintiff has also failed to offer any other evidence, such as comments from decisionmakers revealing discriminatory animus, which creates an inference that Defendants terminated Plaintiff's employment based on her race or sex. Because Plaintiff Lewis is unable to carry her burden of establishing a *prima facie* case, the undersigned **RECOMMENDS** that Defendants' summary judgment motion [Doc. 59] be **GRANTED** on Plaintiff's race and sex discrimination claims against Defendant Odom and Defendant Union City.

### C.    Qualified Immunity

Defendants contend that Plaintiff's § 1981 and Equal Protection claims against Defendant Odom in his individual capacity brought pursuant to § 1983 also fail as a matter of law because Odom is entitled to qualified immunity. [Doc. 59 at 39].

49

"Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Foy v. Holston, 94 F.3d 1528, 1532 (11th Cir. 1996) (citing Harlow v. Fitzgerald, 102 S. Ct. 2727, 2738 (1982)). "Qualified immunity affords 'protection to all but the plainly incompetent or those who knowingly violate the law.'" Crawford v. Carroll, 529 F.3d 961, 978 (11th Cir. 2008) (citation omitted). A defendant invokes qualified immunity by establishing that he "was acting within the scope of his discretionary authority." Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009). In the present case, Defendant Odom was acting within the scope of his discretionary authority when he placed Plaintiff on leave and terminated her employment. Therefore, "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (emphasis in original).

To overcome a claim to qualified immunity, the plaintiff must demonstrate: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (citing Harlow, 102 S. Ct. at 2738); accord Pearson v.

Callahan, 129 S. Ct. 808, 815-16 (2009); Case, 555 F.3d at 1326.  Plaintiff has failed to show that Defendant Odom violated a statutory or constitutional right when he placed Plaintiff on leave and terminated her employment.  As discussed *supra*, a reasonable jury could not view the evidence in the record and conclude that Odom took adverse employment actions against Plaintiff on the basis of her race or sex. Accordingly, the undersigned finds that Plaintiff is unable to carry her burden of showing that Chief Odom is not entitled to qualified immunity and, on this basis, that summary judgment is warranted on Plaintiff's § 1983 claims against Defendant Odom in his individual capacity.

### D.    Municipal Liability

Defendants argue that Plaintiff's § 1981 and Equal Protection claims for racial and sexual discrimination brought pursuant to § 1983 against Defendant Union City "should be dismissed for the additional reason that Plaintiff cannot make the requisite showing of municipal liability."  [Doc. 59 at 37-38].  "In Monell v. Department of Social Services, [98 S. Ct. 2018] (1978), the Supreme Court held that municipalities may not be held liable under 42 U.S.C. § 1983 on a theory of respondeat superior." Scala v. City of Winter Park, 116 F.3d 1396, 1399 (11th Cir. 1997).  "Instead, in Monell and subsequent cases, [the Court has] required a plaintiff seeking to impose

51

liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Board of County Comm'rs of Bryan County, Oklahoma v. Brown, 117 S. Ct. 1382, 1388 (1997). The plaintiff must not only "identify conduct properly attributable to the municipality[,]" he "must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." Id. at (emphasis in original). A plaintiff seeking to impose liability on a municipality through the conduct of an official must show that he or she was a final policymaker over the relevant subject matter. Scala, 116 F.3d at 1397. "[A] municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." Morro v. City of Birmingham, 117 F.3d 508, 514 (11th Cir. 1997).

Chief Odom was the person who made the decision to terminate Plaintiff Lewis' employment. In accordance with Union City policy, Plaintiff appealed her termination to City Manager Steve Rapson. [DSMF ¶ 37]. During the appeal hearing, Plaintiff and her attorney were present, and they submitted additional documentation for Rapson to consider. [Pla. Dep. at 211-12; Rapson Dep. at 64-68]. Rapson reviewed the

documentation submitted to him and heard testimony from Plaintiff among others. [Rapson Dep. at 64-68].

Plaintiff argues that Chief Odom's personnel decisions were not subject to meaningful review by City Manager Rapson because "between the start of his employment in August 2009 and Ms. Lewis's appeal, Steve Rapson affirmed every termination." [Doc. 72 at 39]. Rapson's testimony, as cited by Plaintiff, shows that Rapson affirmed four termination decisions and overturned two suspensions. [Rapson Dep. at 98-100]. This evidence does not support Plaintiff's contention that Rapson did not meaningfully review Chief Odom's personnel decisions. Plaintiff also argues that, although she was terminated for allegedly violating the City's leave policy, Rapson never reviewed whether Plaintiff could continue her leave without pay and never checked to see if she had exhausted her leave. [Brown Dep., Ex. 31; PSMF ¶ 40; Doc. 72 at 39]. However, Rapson testified that Plaintiff did not raise these issues during the appeal hearing. [Rapson Dep. at 64-68]. Rapson stated, "If she had brought this issue up and asked the same questions, it may have been in my consideration. But she didn't . . . . None of that was contested." [Rapson Dep. at 65]. Plaintiff has offered no

evidence to the contrary.  After the appeal hearing, Rapson upheld Chief Odom's decision to terminate Plaintiff's employment.[14]  [Rapson Dep. at 64-68; DSMF ¶ 41].

The record evidence establishes that Chief Odom's personnel decisions were subject to meaningful review.  City Manager Rapson did not merely rubber-stamp Chief Odom's personnel decisions, including his decision to terminate Plaintiff's employment.  Rapson conducted an appeal hearing at which time Plaintiff proffered evidence and gave testimony.  Given these facts, the court concludes that Plaintiff is unable to show that Odom was a final policymaker over termination decisions at the Union City Police Department.  See Scala, 116 F.3d at 1403 ("Because the City Civil Service Board has the power to reverse any termination decision made by Barrett or Younger, neither of them is a final policymaker with respect to termination decisions at the fire department."); Keaton v. Cobb County, 545 F. Supp. 2d 1275, 1315 (N.D. Ga. 2008).  The fact that Plaintiff cannot establish municipal liability is another reason that summary judgment is warranted on her claims against Defendant Union City brought pursuant to 42 U.S.C. § 1983.

---

[14]Rapson testified that the opinion of Plaintiff's physician regarding Plaintiff's ability to be exposed to OC spray also was not raised during the appeal hearing. [Rapson Dep. at 109-10].

AO 72A

(Rev.8/82)

**IV.    Conclusion**

For the foregoing reasons, the undersigned **RECOMMENDS** that the motion [Doc. 59] for summary judgment filed by Defendants City of Union City and Chief of Police Charles Odom be **GRANTED** on all of Plaintiff Jacqueline Lewis' claims.

All pretrial matters have been concluded with the issuance of this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), this Court's Local Rule 72.1, and Standing Order 14-01 (N.D. Ga. August 15, 2014).  The Clerk, therefore, is **DIRECTED** to terminate the reference to the Magistrate Judge.

**SO RECOMMENDED** this 26th day of November, 2014.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

55